UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RAYMOND HAWKINS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:22-cv-01434-JMS-MKK ) |
| WENDY KNIGHT Warden, et al., | ) ) |
| Defendants. | ) ) |

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Raymond Hawkins, currently an inmate at New Castle Correctional Facility, filed this action under 42 U.S.C. § 1983 alleging that he was subjected to unconstitutional conditions of confinement in violation of the Eighth Amendment when he was an inmate at Correctional Industrial Facility ("CIF"). Defendants Wendy Knight and Adriana Jacho have moved for summary judgment. Dkt. [48]. For the reasons below, that motion is **DENIED**.

**I.
Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need

1

not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Hawkins and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

In April and May 2022, Mr. Hawkins was an inmate in general population at CIF, housed in C-Dorm. Dkt. 49-1, p. 10-11. At CIF, the cells in general population, including those in C-Dorm, do not have toilets. Dkt. 49-2, p. 1. The cells in A-Dorm, a segregation unit, do have individual toilets in each cell. *Id.* Mr. Hawkins had been in segregation in A-Dorm in late March 2022 but moved to C-Dorm in early April. Dkt. 57-1, p. 79. Mr. Hawkins thereafter was not eligible for placement in segregation. Dkt. 49-2, p. 1.

In C-Dorm, there are four shared restrooms, two on each floor. *Id.* During the day, inmates are allowed outside their cells and thus have free access to the restrooms. *Id.* at 2. During lockdowns or between the hours of 10 p.m. and 3 a.m. (when inmates are confined to their cells),

inmates can press a call button to ask a guard to allow them to use a restroom. *Id.* During count times, which occur six times a day and usually last approximately thirty minutes, inmates generally are not allowed out of their cells for safety and security reasons. *Id.* During lockdowns, CIF policy provided that inmates should be offered use of the restroom every two hours. *Id.*

CIF had a physician, whom Mr. Hawkins recalled was named Dr. Savino, who used to regularly write restroom passes for inmates who needed to use the restroom more frequently than every two hours during lockdowns, due to medical problems or prescription medication side effects. Dkt. 49-1, pp. 32. However, Warden Knight directed Dr. Savino to stop issuing such passes. *Id.* at pp. 34, 38. Thereafter, Dr. Savino put up a sign in her office noting the every-two-hours bathroom policy and that she could no longer issue medical exceptions to that policy. *Id.* at 33-34. When Mr. Hawkins sought to obtain a medical pass for more frequent restroom use due to medication he was taking (hydrochlorothiazide and tamsulosin), Dr. Savino referred him to Warden Knight's no-exceptions two-hour policy and did not issue such a pass. *Id.* Individual guards, in their discretion, could still allow inmates to use the restroom more frequently than every two hours. *Id.* at 39. Mr. Hawkins indicated in his deposition that some guards would be generous with allowing restroom breaks for inmates with known medical issues, and others would not be and would insist that no break was required for at least two hours. *Id.* at 39-40. Mr. Hawkins also stated in his deposition that inmates being denied adequate restroom access was a "big problem" at CIF. *Id.* at 32.

From April 30 to May 1, 2022, Sgt. Jacho was the officer in charge of Mr. Hawkins's part of C-Dorm. Dkt. 49-3, p. 1. She had access to each inmate's medical information. *Id.* at p. 2. In the evening hours of April 30 and continuing into May 1, C-Dorm went on lockdown because of an incident involving another inmate or inmates who had to be moved to segregation. *Id.* The

3

lockdown began at about 9:20 p.m. Dkt. 49-1, p. 51. Sgt. Jacho helped escort the inmate(s) out of C-Dorm and returned about 20-25 minutes later. *Id.* at pp. 46, 48. When Sgt. Jacho first returned to C-Dorm, Mr. Hawkins and other inmates asked her if they could use the restroom; she ignored the requests. *Id.* at 59. Other guards did not come through Mr. Hawkins's part of C-Dorm until close to midnight to offer restroom breaks—a delay of approximately 2.5 hours since the last pre-lockdown opportunity to use the restroom. *Id.* By that time, Mr. Hawkins had urinated on himself. *Id.* It is not precisely clear when Mr. Hawkins urinated on himself—more or less than 2 hours after the previous restroom break. Mr. Hawkins asked for permission to wash himself, but he was not allowed to do so and was directly ordered by Sgt. Jacho to return to his cell 5 minutes after he had been let out. Dkt. 57-1, p. 4.

After this incident, Mr. Hawkins and the other C-Dorm inmates were not given another opportunity to use the restroom for almost 3 hours. *Id.* at pp. 4-5. Again, Mr. Hawkins urinated on himself, and was denied the opportunity to clean himself when he finally was allowed to use the restroom. *Id.* Although Sgt. Jacho did not personally direct Mr. Hawkins to return to his cell without cleaning up after this second incident, a guard told him that he was following orders from Sgt. Jacho. *Id.* at 5. Also, guards told Mr. Hawkins that they had been ordered by Sgt. Jacho to uphold Warden Knight's every-two-hours limit on restroom access. *Id.* at 3.

About 2 days after these incidents, Mr. Hawkins developed a painful and irritating rash on his thighs where he had urinated on himself. He ties the rash to not being able to clean up after urinating on himself, and Defendants have designated no evidence to the contrary.

At all relevant times, Warden Knight was the CIF warden. Dkt. 49-2, p. 1. She did not have any control over which inmates were placed at or transferred to CIF, which is governed by the Indiana Department of Correction Central Office. *Id.* at 2. She was not personally aware of Mr.

4

Hawkins's medical conditions or medications and was not present in C-Dorm on April 30-May 1, 2022. *Id.* at 3. She has had no formal medical training. *Id.*

### III.
### Discussion

**A. Conditions of Confinement**

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Adequate facilities to wash and use the toilet are among the minimal civilized measures of life's necessities that must be afforded prisoners. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *Vinning–El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007).

Defendants argue that Mr. Hawkins was not prevented from requesting restroom access during the April 30-May 1 lockdown. Dkt. 50, p. 6 (citing dkts. 49-2, p. 2 and 49-3, p. 4). Therefore, they claim, Mr. Hawkins was not subjected to unconstitutional conditions of confinement. But, being able to *request* restroom access is much different than actually being *granted* access. On that point, there are genuine issues of material fact. Viewing that dispute in a light most favorable to Mr. Hawkins, he was not actually granted restroom access for well over 2 hours on 2 separate occasions on April 30-May 1, because of a combination of Warden Knight's termination of inmates' ability to obtain medical passes to use the restroom more often and Sgt. Jacho's orders to her subordinates to strictly adhere to the every-two-hour limit. Because of those delays and Mr. Hawkins's prescription medications, he was twice forced to urinate on himself. And, because of Sgt. Jacho's orders, Mr. Hawkins was unable to clean himself off after these incidents and developed a painful and irritating rash as a result. A reasonable jury that believed Mr. Hawkins's version of these events may conclude that, having been denied adequate access to

5

the restroom, he was denied the minimal civilized measures of life's necessities. *See Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006) ("A lack of heat, clothing, or sanitation can violate the Eighth Amendment.") (collecting cases). *Cf. also Rose v. Carey*, No. 1:06-CV-1504-SEB-JMS, 2008 WL 4443229, at *4 (S.D. Ind. Sept. 25, 2008) (holding defendants were entitled to summary judgment on claim of lack of adequate access to prison restroom facilities where defendants were not alleged to "have unnecessarily delayed [plaintiff's] access to a restroom in circumstances where there was a medical need for that access").

### B. Personal Responsibility

Both Defendants also argue that there is a lack of any evidence that either were personally involved in the incidents at issue. "'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.* "[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")). Whether supervisory personnel at a prison are sufficiently involved in an alleged constitutional violation such that they may be liable for damages often depends on that person's knowledge of, and responsibilities regarding, the alleged harm.

6

Something more than generalized knowledge and inaction is required for personal responsibility. Although what additional allegations are required are case-specific, two scenarios are illustrative. First, a defendant could be actually engaged with the underlying issue such that personal responsibility is present. *See, e.g., Haywood v. Hathaway*, 842 F.3d 1026, 1032-33 (7th Cir. 2016) (holding that the Warden could be held personally responsible for the harm caused by cold prison conditions because the evidence showed he "had actual knowledge of the unusually harsh weather conditions, that he had been apprised of the specific problem with the physical condition of [the plaintiff's] cell (i.e., the windows would not shut), and that, during the time period of [the plaintiff's] complaint, the warden toured the segregation unit himself"). Or second, personal responsibility can be present when the underlying issue is the direct responsibility of the individual in question, rather than one for his or her subordinates. *Compare id.*; *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (holding that the Warden was personally responsible for the alleged cell conditions because the Warden "not only knew about the problems but was personally responsible for changing prison policies so that they would be addressed"), *with Burks*, 555 F.3d at 595 (holding that the supervisor at issue was not personally responsible; "[t]he Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care."). And even if "a supervisor is not involved in day-to-day operations, [her] personal involvement may be found if [s]he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Stewart v. Precythe*, 91 F.4th 944, 949 (8th Cir. 2024) (citations omitted).

### i. Warden Knight

It is undisputed that Warden Knight did not know anything personally about Mr. Hawkins's medically-based need to use the restroom more than every 2 hours, that she had no say in whether

7

to accept him as an inmate at a facility that does not have toilets in all cells, and that she had no personal involvement in the events of April 30-May 1, 2022. However, if Mr. Hawkins's version of events is accepted as it must be for purposes of summary judgment, she did directly and personally forbid CIF medical staff from issuing passes for more frequent restroom access for those inmates who might need it due to medical necessity. In other words, she overrode the medical staff's judgment on this point and replaced it with her own, despite her lack of formal medical training. After this new policy was put in place, CIF guards exercised widely varying discretion in whether or how often they would allow inmates to use the restroom during a 2-hour lockdown period. And on April 30-May 1, the policy was strictly applied in such a way that directly led to Mr. Hawkins twice urinating on himself.

The Court acknowledges some uncertainty as to whether Mr. Hawkins urinated on himself more or less than 2 hours after his last opportunities to use the restroom. But, even if the Court were to accept that Mr. Hawkins's two accidents occurred more than two hours after his last opportunity to use the restroom, that is, longer than allowed by the official CIF restroom policy authorized by Warden Knight, there still remains the fact (viewing the evidence in a light most favorable to Mr. Hawkins) that the accidents could have been avoided if Warden Knight had not completely done away with medical passes allowing for more frequent restroom breaks for those inmates who needed them. A reasonable jury could conclude that Warden Knight was personally involved in crafting and implementing a policy that led to unconstitutional conditions of confinement. *Cf. Rose*, 2008 WL 4443229, at *4 (holding defendant was not deliberately indifferent to plaintiff's need to use the restroom more frequently where he advised plaintiff to discuss with medical staff whether he had a medical issue that required special restroom access).

8

### ii. Sgt. Jacho

Sgt. Jacho contends that because of her handling of the lockdown incident on April 30-May 1, and her not being directly in Mr. Hawkins's section of C-Dorm during much of that time frame, she had no personal involvement in Mr. Hawkins's deprivation of restroom access. However, Mr. Hawkins's version of events is that when she did return to that part of the dorm after taking the inmate(s) to segregation, many inmates including himself called out and requested restroom access, and she ignored them. Also, Mr. Hawkins asserts there were repeated such demands to use the restroom that Sgt. Jacho should have been able to hear, even if she was not directly in his unit. He also claims Sgt. Jacho directly ordered him to return to his cell without washing after the first incident. Finally, he asserts that he was repeatedly informed by other guards that Sgt. Jacho was insisting on strict implementation of Warden Knight's no-exceptions every-two-hours limit on restroom access. From this evidence, a reasonable jury could find that Sgt. Jacho did not merely fail to adequately supervise her subordinates or fail to respond to complaints about them, but that she was directly involved in creating unconstitutional conditions of confinement.

### C. Qualified Immunity

Finally, both Defendants assert that they are entitled to qualified immunity. "[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To overcome the defendant's invocation of qualified immunity, [a plaintiff] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705

9

F.3d 706, 713 (7th Cir. 2013). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)). To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 583 U.S. at 64 (quoting *Anderson*, 483 U.S. at 641). Although "a case directly on point" is not required, "precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). Put slightly differently, a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2017) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quotation marks omitted)). Qualified immunity thus "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

As this Court noted in another case involving lack of restroom access at CIF, "[i]t was well-established at the time of [Mr. Hawkins's] allegations that a lack of sanitation can violate the Eighth Amendment." *May v. Knight*, No. 1:20-cv-01792-JMS-DML, 2022 WL 2802396, at *4 (S.D. Ind.

July 18, 2022) (citing *Gillis*, 468 F.3d at 493; *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989); and *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987)). Even if Mr. Hawkins "has not pointed to a case that is directly on point to this case, existing precedent has put the constitutional question beyond debate." *Id.* (citing *Ashcroft*, 563 U.S. at 741).

The Court also believes Warden Knight had been put on notice by the Seventh Circuit, before 2022, that a strict every-two-hours restroom opportunity during lockdowns, while constitutional as a general matter, in fact potentially could be unconstitutional as applied to inmates with a demonstrated medical need to use the restroom more frequently. In *White v. Knight*, 710 F. App'x 260, 261-62 (7th Cir. 2018), the Court upheld the general constitutionality of the every-two-hours policy. But, the Court added, "[w]e can leave to one side the question whether *Farmer* would require a different analysis for a prisoner who alleges that his particular need for an exemption from a general bathroom policy arises from a medical condition that is known to the defendants at the relevant time." *Id.* The plaintiff in that case had mentioned to a guard having a medical need to use the restroom more frequently, but "neither of the complaints makes anything of this medication issue . . . ." *Id.* Here, Mr. Hawkins's alleged medical need to use the restroom more frequently is a key part of his complaint. And even though he does not allege that Warden Knight personally knew of his need to use the restroom more frequently, she should have been aware after the *White* case that a blanket no-exceptions, every-two-hours policy could lead to unconstitutional conditions of confinement for inmates with special medical needs to use the restroom more frequently.

In sum, because Mr. Hawkins has submitted evidence that he was denied adequate restroom facilities and sanitation, Defendants are not entitled to summary judgment on their qualified immunity defense.

## IV.
## Conclusion

Defendants' motion for summary judgment is **DENIED**. Dkt. [48]. There is sufficient designated evidence from which a reasonable jury might conclude he was subjected to unconstitutional conditions of confinement by the personal actions of both Defendants.

The Court now sua sponte reconsiders Mr. Hawkins's motion for counsel, dkt. 3, and will attempt to recruit counsel to represent him through final judgment. However, **the clerk is directed** to send Mr. Hawkins a form motion for assistance with recruiting counsel. Because this form contains the terms of accepting counsel, Mr. Hawkins must complete the form and return it no later than **July 1, 2024,** if he seeks the Court's assistance. Mr. Hawkins's failure to timely complete and return the form will be construed as abandonment of his request for counsel. The Magistrate Judge is requested to set the matter for a telephonic status conference once recruited counsel has appeared or if Mr. Hawkins abandons his request for counsel.

**IT IS SO ORDERED.**

Date: 5/30/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

RAYMOND HAWKINS
885871
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

Magistrate Judge Klump's Chambers